IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CLARENCE A. HERNANDEZ,<br><br>               Petitioner,<br><br>   vs.<br><br>LORETTA A. LYNCH, United States<br>Attorney General.<br><br>               Respondent. | CIVIL NO. 12-00639 JMS-BMK<br>(Ninth Cir. App. No. 09-73088)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

Petitioner Clarence Agcaoili Hernandez ("Petitioner") has an appeal

pending before the Ninth Circuit Court of Appeals challenging an Immigration

Judge's order removing him to the Philippines (where he was born) because of his

State of Hawaii convictions for an aggravated felony and crimes involving moral

turpitude. The Ninth Circuit has transferred the action to this court pursuant to 8

U.S.C. § 1252(b)(5)(B)[1] for the limited purpose of making a *de novo* factual

---

[1] Section 1252(b)(5)(B) provides:

> If the petitioner claims to be a national of the United States and the
> court of appeals finds that a genuine issue of material fact about the
> petitioner's nationality is presented, the court shall transfer the
> proceeding to the district court of the United States for the judicial

(continued...)

determination of Petitioner's claim of derivative United States citizenship.  After

stipulated periods for discovery and examination of entirely new evidence, the

court conducted a non-jury trial on this limited question on March 11, 2015.

Pursuant to Federal Rule of Civil Procedure 52(a), the following

constitute the court's Findings of Fact ("Findings") and Conclusions of Law

("Conclusions").  To the extent any Findings as stated may also be deemed as

Conclusions, they shall also be considered Conclusions.  Similarly, to the extent

any Conclusions as stated may be deemed to be Findings, they shall be considered

Findings.  *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982)

("The fact that a court labels determinations 'Findings of Fact' does not make

them so if they are in reality conclusions of law.") (citation omitted).

The court finds and concludes that Petitioner has failed to meet his

burden to prove his claim of derivative United States citizenship.  Judgment shall

issue in favor of Respondent Loretta A. Lynch, United States Attorney General

("Respondent" or the "government").[2]

---

[1](...continued)
> district in which the petitioner resides for a new hearing on the
> nationality claim and a decision on that claim as if an action had
> been brought in the district court under section 2201 of Title 28.

[2] Loretta A. Lynch, in her capacity as United States Attorney General, is substituted for
Eric Holder, Jr. as Respondent.  *See* Fed. R. Civ. P. 25(d).

## II. <u>OVERVIEW/SUMMARY</u>

The details of this case are confusing, although the ultimate issue is straightforward -- whether Petitioner was born "out of wedlock" under Philippine law. The court thus begins with this overview to explain the context, and to summarize the Findings and Conclusions that follow.

Petitioner was born in the Philippines on September 8, 1976. His mother, Clara Agcaoili Hernandez ("Clara"), is a United States citizen by virtue of her birth on Maui, Territory of Hawaii, on August 18, 1934. Clara moved to the Philippines in 1935, and did not return to Hawaii until 1977. Petitioner was later admitted to the United States as a lawful permanent resident ("LPR") on February 9, 1983 as a child of a United States citizen.

Petitioner's father, Lorenzo Hernandez ("Lorenzo"), is a citizen of the Philippines. Clara and Lorenzo were married on June 28, 1975 in the Philippines. Clara, however, had several other children during her lifetime, and had at least one previous marriage -- the case requires understanding the details and documentation (or lack thereof) of some of these children and Clara's marriages.

On June 14, 2000, Petitioner was convicted of several counts of burglary under Hawaii state law, and sentenced to five years in prison. After his release, he was convicted of theft under Hawaii state law in 2007. On December

11, 2008, the U.S. Department of Homeland Security charged Petitioner with removability to the Philippines as an alien convicted of an aggravated felony, and of two or more crimes involving moral turpitude. *See* 8 U.S.C. § 1227(a)(2)(A)(ii) & (iii). An Immigration Judge ordered him removed, and the Board of Immigration Appeals ("BIA") upheld that Order. Petitioner appealed to the Ninth Circuit, which transferred the action to this court to determine Petitioner's claim of derivative citizenship -- he claims that he cannot be removed regardless of the nature of his convictions because he is actually a United States citizen (not a citizen of the Philippines with LPR status). *See, e.g.*, *Rivera v. Ashcroft*, 394 F.3d 1129, 1136 (9th Cir. 2005) ("The executive may deport certain aliens but has no authority to deport citizens."), *superseded by statute on other grounds as explained in Iasu v. Smith*, 511 F.3d 881, 884 (9th Cir. 2007).

Petitioner's claim to citizenship is based on 8 U.S.C. § 1409(c), which (as in effect in 1976 at the time of Petitioner's birth) provided:

> Notwithstanding the provision of subsection (a) of this section, a person born, on or after [December 24, 1952], outside the United States and *out of wedlock* shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

4

8 U.S.C. § 1409(c) (1952) (emphasis added).  Although Petitioner's parents were

married on June 28, 1975, Petitioner claims that Clara was still married to another

man, Jose Ramos ("Ramos"), at that time.

If Clara had married Ramos previously, and if Ramos was still alive

on June 28, 1975, then the marriage of Petitioner's parents (Clara and Lorenzo)

was void under Philippine law.[3]  And if that marriage was void, then Petitioner is

an "illegitimate child," having been born "out of wedlock" for purposes of

§ 1409(c).  Petitioner would have been born a United States citizen, with

citizenship derived from Clara under § 1409(c).[4]  Accordingly, the non-jury trial

focused on these two questions:  was Clara married to Ramos before she married

Lorenzo in 1975?  Was Ramos still alive when Clara married Lorenzo?

In June 2014, about eighteen months after the Ninth Circuit

transferred the action to this court, Petitioner provided the government a copy of a

document entitled "Marriage Contract," dated November 12, 1970 (the "purported

Marriage Contract"), that purports to indicate that Clara and Ramos were married

---

[3]  There is no evidence that Clara was ever divorced or legally separated from anyone, whether under Philippine or United States law.  She testified several times that "there's no divorce in the Philippines."  Doc. No. 66, Tr. at 52, 78, 89, 98.

[4]  The parties agree that the other requirements of § 1409(c) are met -- Clara "had the nationality of the United States at the time of such person's birth," and she "had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year."

on November 12, 1970 in "St. Peter The Martyr Parish Church," in "Pamplona, Cagayan," Philippines.[5]  No other documentary evidence of a marriage between Clara and Ramos was submitted at trial, and both (1) the Office of the Civil Registrar in Pamplona, Cagayan, and (2) the Office of the Municipal Civil Registrar, in Santa Maria, Pangasinan municipality have indicated they have no record of such a marriage.  Much of the trial focused on the authenticity, content, and meaning of this purported Marriage Contract.  (The parties have otherwise stipulated to many of the salient facts, and have submitted evidence supporting their stipulations.)

The court has carefully considered and assessed Clara's trial testimony, as well as the other evidence and Stipulations submitted by the parties at trial.  The purported Marriage Contract, although the court now admits it into evidence, is incomplete.  Petitioner has failed to prove that it is legitimate, and it is otherwise of questionable origin.  No affidavit, documentation, or other evidence

---

[5]  The purported "Marriage Contract" was not in the record before the Ninth Circuit, and had not previously been disclosed to the government.  Given this newly-discovered document, Petitioner's theory of illegitimacy changed after the action was transferred to this court.  That is, the parties stipulated that "[in] prior legal proceedings before the Immigration Judge, the [BIA], and the [Ninth Circuit], Petitioner's counsel argued that Petitioner was illegitimate because [his birth certificate] stated that the parents of Clarence Hernandez did not report or register their marriage until October 5, 1976, after the birth of Clarence A. Hernandez on September 8, 1976." Gov't Ex. 3, Doc. No. 24, Stipulation Regarding Birth Certificate ¶ 9.  They further stipulated that "Petitioner now abandons this argument and no longer asserts that Petitioner is illegitimate related to the reporting and registration of the marriage between [Clara and Lorenzo] on [Petitioner's birth certificate]."  *Id.* ¶ 11 (emphasis omitted).

explains where it came from (other than Clara's vague testimony, which is not credible in this regard). These uncertainties render the purported Marriage Contract of little, if any, value in making the ultimate determination of whether Clara and Ramos were ever married (much less married on November 12, 1970).

And Clara's testimony -- when considering the combination of her confused manner of testifying, recall (or lack of recall) of material and relevant events, contradictions and inconsistencies with prior testimony and sworn statements on related immigration documents, and her potential bias in favor of her son -- was ultimately not credible as to key points. Although she claims she was previously legally married to Ramos, the court does not credit such testimony. In the absence of any reliable documentation of a marriage between Clara and Ramos (and compared to the documentation from Philippine officials that there is no record of such a marriage in relevant Philippine government files, as well as immigration documents that lack any reference to such a marriage), the court concludes that Petitioner has failed to meet his burden to prove his claim of derivative citizenship.[6] *See, e.g.*, *Chau v. I.N.S.*, 247 F.3d 1026, 1029 n.5 (9th Cir. 2001) ("[E]vidence of foreign birth gives rise to a rebuttable presumption of

---

[6] It is, however, likely that Ramos was alive in 1993, when Clara attended a funeral in the Philippines for Romeo Ramos (a child born to Clara and Ramos in 1968) -- and, if so, he was alive when Clara and Lorenzo were married in 1975.

alienage, shifting the burden to the respondent."); *Murphy v. I.N.S.*, 54 F.3d 605, 609-10 (9th Cir. 1995) (indicating that a respondent with foreign birth subject to deportation bears the burden of proving derivative citizenship by a preponderance of the evidence); *Sanchez-Martinez v. I.N.S.*, 714 F.2d 72, 74 n.1 (9th Cir. 1983) (same).

### III.  <u>PROCEDURAL HISTORY</u>

The Ninth Circuit transferred this action to this court on November 29, 2012.  Doc. No. 1.  On December 11, 2012, the parties agreed upon a six-month period for discovery.  Doc. No. 7.  On June 10, 2013, the parties agreed that additional time was needed to complete discovery, Doc. No. 10, and in November 2013, a trial date was set for June 2014.  Doc. No. 14.  Trial briefs, Stipulations, and proposed Findings and Conclusions were filed on April 4, 2014, Doc. Nos. 20-27, but proceedings were continued while the parties attempted to negotiate a settlement.  *See, e.g.*, Doc. Nos. 28, 31.

Meanwhile, in June 2014, Petitioner produced the newly-discovered November 12, 1970 purported "Marriage Contract," the original of which was provided to the government on August 29, 2014.  *See* Doc. Nos. 32, 51. Proceedings were continued while the government investigated this new evidence, and while Petitioner's counsel, Ms. Cora Avinante, was unable to practice law in

this court for nearly six months (with different counsel substituted for that period).

*See* Doc. Nos. 38, 45, 47.  A new trial date was set for March 2015.  Doc. Nos. 43, 49.

Supplemental Stipulations and trial briefs were filed on February 20, 2015, Doc. Nos. 51-55, and trial was held on March 11, 2015.  Doc. No. 64.  At trial, Clara testified through a certified Ilocano interpreter.  The court admitted into evidence government Exhibits 1 to 5 (including subparts 4A to 4HH), and government Exhibits 7 and 8 (including subparts 8A to 8F).[7]  Government Exhibit 6 (the purported Marriage Contract) was not admitted into evidence at trial, but -- as discussed below -- is now admitted into evidence for purposes of the court's Findings and Conclusions.  Thus, the court bases these Findings and Conclusions on the following evidence:  (1) the Stipulations and Supplemental Stipulations of the parties (filed on April 4, 2014, and on February 20, 2015); (2) Clara's trial testimony; and (3) government Exhibits 1 to 8 (including subparts).

After the close of evidence, the court heard closing arguments.  Doc. No. 66.  Following trial, on May 26-27, 2015, the parties filed memoranda regarding the admissibility of government's Exhibit 6, Doc. Nos. 68, 69-1, and

---

[7]  The court granted the government's motions in limine to exclude and/or sustained objections to Petitioner's proffered Exhibits.  *See* Doc. No. 66, Tr. at 12, 14, 69.

revised proposed Findings and Conclusions.  Doc. No. 67, 69.  The court has carefully considered the trial evidence, and all written and oral argument in making the following Findings and Conclusions.

## IV.  <u>FINDINGS OF FACT</u>

**A.     The Nature of the Dispute**

1.   Petitioner seeks to establish that he is a United States citizen by proving that his parents' marriage is void and thus that he was born an illegitimate child.  Petitioner was admitted to the United States as an LPR on February 9, 1983, as the child of a United States citizen.  Doc. No. 21, Stipulation of Facts (Apr. 4, 2014) ("April 2014 Stip. Facts") at 1.

2.   On June 14, 2000, Petitioner was convicted of three counts of burglary in the second degree in violation of Hawaii Revised Statutes ("HRS") § 708-811, as well as one count of attempted burglary in the second degree in violation of HRS §§ 705-500 & 708-811.  Because of these convictions, Petitioner was sentenced to four five-year terms of imprisonment to be served concurrently. On December 26, 2007, less than three years after his release from prison, Petitioner was convicted of theft in the second degree in violation of HRS § 708-831(1)(b).  Because of this conviction, Petitioner was sentenced to 104 days of confinement and five years of probation.  *Id.* at 1-2.

3.  On December 11, 2008, the Department of Homeland Security personally served Petitioner with a Notice to Appear, charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien convicted of a theft offense aggravated felony, as well as under 8 U.S.C. § 1227(a)(2)(A)(ii), as an alien convicted of two or more crimes involving moral turpitude not arising out of a single scheme of criminal misconduct. *Id.* at 2.

4.  On May 14, 2009, an Immigration Judge concluded that Petitioner was removable as charged and ineligible for relief from removal.  The Immigration Judge also determined that Petitioner's mother did not have the requisite physical presence in the United States or one of its outlying possessions to transmit citizenship to Petitioner pursuant to the former 8 U.S.C. § 1401(a)(7) (redesignated in 1978 as § 1401(g)).[8]  The Immigration Judge ordered Petitioner

---

[8]  Section 1401(g) provides in pertinent part:

> The following shall be nationals and citizens of the United States at birth:
> . . . .
> (g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years[.]

Although he had done so in earlier proceedings, Petitioner is no longer claiming a right to

(continued...)

removed to the Philippines.  *Id.* at 2-3.

5.  On August 31, 2009, the BIA dismissed Petitioner's appeal of the Immigration Judge's May 14, 2009 Order.  In its decision, the BIA concluded that the Immigration Judge correctly determined that Petitioner's birth was legitimate, and that his mother did not have the requisite physical presence in the United States or one of its outlying possessions to transmit citizenship to Petitioner under the former 8 U.S.C. § 1401(a)(7) (redesignated in 1978 as § 1401(g)).  *Id.* at 3. The BIA also rejected Petitioner's claim to derivative citizenship under 8 U.S.C. § 1409(c), which was based on an argument that he was born out of wedlock. Doc. No. 2 at 4, BIA Order at 2 n.1.

6.  Pursuant to 8 U.S.C. § 1252(a), the Ninth Circuit is considering this case on judicial review of the BIA's decision.  The Ninth Circuit determined that there are genuine factual disputes regarding the marital status of Petitioner's parents at the time of his birth precluding a determination of his claim of derivative citizenship.  Pursuant to 8 U.S.C. § 1252(b)(5)(B), the Ninth Circuit transferred this case to the United States District Court for the District of Hawaii, the District in which Petitioner resides, for the limited purpose of making a *de*

---

[8](...continued)
citizenship under this provision.

*novo* determination of Petitioner's claim of United States citizenship.  April 2014 Stip. Facts at 3-4.

**B.      Petitioner's Mother and Her Prior Husbands (or Putative Husband)**

7.  Clara, a United States citizen, is Petitioner's mother.  Other names she has used besides Clara Agcaoili Hernandez are: Clara Agcauili, Clara Aguaoili, Clara Agcaoili, and Eulogia Agcaoili.  *Id.* at 4.

8.  Felipe A. Arellano, Sr., a.k.a. Felipe Arellano, a Philippine citizen, was Clara's first husband.  They were married on April 30, 1958 in Ballesteros, Cagayan, Philippines.  Felipe Arellano died on February 23, 1967 in Aparri, Cagayan, Philippines.  *Id.* at 4, 7, 9.

9.  Ramos, a Philippine citizen, is the putative second husband of Clara.  *Id*. at 4.  The evidence did not establish whether Ramos is still alive, although (as of September 2013) there is no death certificate registered for Ramos in Ballesteros, Cagayan.  *Id.* at 16.

10.  Lorenzo, a Philippine citizen, is the father of Petitioner.  *Id.* at 4. Clara and Lorenzo were married on June 28, 1975 in Aparri, Cagayan, Philippines. *Id.* at 11-12.  The evidence did not establish whether Lorenzo is still alive.

**C.      Clara's Citizenship and Years of Physical Presence in the United States or a Possession of the United States**

11.  Clara is a United States citizen because she was born in

Maui, Territory of Hawaii, on August 18, 1934.  *Id.* at 5.

12.  In 1935, Clara moved with her family to the Philippines.  All of the records regarding Clara arriving in the Philippines were destroyed.  After she arrived in the Philippines, Clara grew up, married, and started her own family.  She never left the Philippines from 1935 until 1977, when she returned to the State of Hawaii.  *Id.*

13.  In 1898, the Philippines became a territory and possession of the United States, and remained a territory until its independence on July 4, 1946.  Thus, from Clara's birth on August 18, 1934 until Philippine independence on July 4, 1946, Clara lived in a territory and possession of the United States.  *Id.*

14.  Before Petitioner's birth, Clara was physically present in the United States or one of its outlying possessions for a continuous period of at least one year, and for a period or periods totaling more than eleven years.  Before the birth of Petitioner, however, Clara was not physically present in the United States or its outlying possessions for at least five years after she attained the age of fourteen years.  *Id*. at 5-6.

**D.    Clara's Children and Marriages to Felipe Arellano and Lorenzo Hernandez**

15.  Between December 4, 1950, and September 27, 1966, Clara and Felipe Arellano had six children -- two born before they married and four after

14

their April 30, 1958 marriage.  Clara eventually brought all six of these children to the United States and they became United States citizens.  *Id.* at 12-13.

16.  These six children of Clara and Felipe Arellano are:

(1) Bernardo Arellano (born on December 4, 1950); (2) Jovencia Arellano (born on June 1, 1953); (3) Felipe A. Arellano, Jr. (born on January 22, 1961); (4) Celilia Arellano Ramos (born in 1961-62, exact date not established by the evidence); (5) Eddie Arellano (born May 5, 1963); and (6) Clodualdo Arellano (born September 27, 1966).  *Id.* at 6-9.

17.  Clara had a seventh child, Romeo Ramos, who was born on December 1, 1968.  Romeo Ramos' father was Jose Ramos (the same "Ramos" whom Petitioner seeks to establish as a former husband of Clara).  *Id.* at 9-10.  Romeo Ramos died on October 23, 1993 in the Philippines.  *Id.* at 15.

18.  Romeo Ramos' birth certificate lists Ramos as his father, with the "date and place of marriage of parents" as "1966 Ballesteros, Cagayan."  *Id.* at 10; Gov't Ex. 4H.  The parties, however, agree that no marriage occurred between Clara and Ramos in 1966.  April 2014 Stip. Facts at 10.  (As found above, Clara's first husband, Felipe Arellano, died on February 23, 1967 in the Philippines.  Felipe Arellano's death certificate lists Clara as his surviving spouse.  *Id.* at 9.).

19.  On April 16, 1973, Clara had an eighth child, Domingo Agcaoili.

*Id.* at 10-11.  Domingo Agcaolili's birth certificate does not list the identity of his father, does not list a "date and place of marriage of Parents," and contains Clara's name (but not a father's name) in an incomplete portion of the form titled "to be accomplished in case of an illegitimate child."  *Id.* at 11; Gov't Ex. 4J.  A certified birth record from the Cagayan Province Civil Registrar confirms that Domingo Agcaoili was born on April 16, 1973, but the record does not list a name of a father, and states that Domingo Agcaoili is "illegitimate."  Gov't Ex. 4K.  That is, although Clara asserts that Ramos is Domingo Agcaolili's father (*see, e.g.*, Doc. No. 66, Tr. at 31, 51), neither form lists Ramos as his father, and neither form lists Clara and Ramos as having been married prior to Domingo Agcaoili's birth.[9]

20.  Clara testified that Domingo Agcaolili's last name is not "Ramos" "[b]ecause [Ramos] left us, and I don't know where he went and he never came back for us."  *Id.* at 51.  Based on Clara's testimony, it is likely that Ramos is Domingo Agcaoili's father, but her testimony in this regard does not establish that Clara and Ramos were married.  Instead, Clara's testimony, coupled with government Exhibits 4J and 4K, is consistent with them not having been

_____

[9]  On March 25, 1985, Clara executed a government Form I-130, Petition to Certify Status of Alien Relative for Issuance of Immigration Visa, for Domingo Agcaoili.  Gov't Ex. 4EE.  The Form I-130 lists Domingo Agcaoili as Clara's "Illigitimate [sic] son," states that her spouse is Lorenzo (with a June 28, 1975 marriage), and provides that her "prior spouses" are "Felipe Arellano."  *Id.*; April 2014 Stip. Facts at 14-15.  That is, it also does not list a prior marriage to Ramos.

married.

21. On June 28, 1975, Clara and Lorenzo were married in the Philippines. April 2014 Stip. Facts at 11-12. On September 8, 1976, Petitioner was born -- the first child of Clara and Lorenzo, and Clara's ninth child. *Id.* at 12. Petitioner's birth certificate has boxes to check "yes" or "no" to indicate whether he was "legitimate," but neither box was checked. *Id.*; Gov't Ex. 4L. The birth certificate, however, states that Lorenzo is his father, and that Clara and Lorenzo were married on June 28, 1975. Gov't Ex. 4L. A Cagayan Province certification of birth states that Petitioner's birth is "legitimate," and that Clara was married to Lorenzo on "[undecipherable]-28-75" in "Sta. Maria, Pangasinan." Gov't Ex. 4M; April 2014 Stip. Facts at 12.

22. The evidence contains several Form I-130, Petitions to Certify Status of Alien Relative for Issuance of Immigration Visa, which Clara submitted in the 1980s and 1990 when seeking admission of her children to the United States. Gov't Exs. 4BB to 4FF. None of these I-130s states that Clara had a prior marriage to Ramos -- rather, sometimes "N/A" was written in a space on the forms for "names of prior spouses." Gov't Exs. 4BB, 4CC, 4DD. The forms, however, list Clara's marriage to Lorenzo on June 28, 1975, and one of the forms lists her prior marriage to Felipe Arellano. Gov't Ex. 4EE.

**E.     The November 12, 1970 Purported Marriage Contract**

23.  Petitioner has proffered a document purported to be a Marriage Contract between Clara and Ramos.  Gov't Ex. 6.  In this regard, the document references the following:

- Place of Marriage: St. Peter The Martyr Parish Church;

- Date of Marriage: November 12, 1970;

- Marriage Solemnized by: Rev. Fr. Victor Ramos; and

- Marriage License No. 11461 issued at Pamplona, Cagayan, November 12, 1970.

*Id.*; Doc. No. 51, Gov't Ex. 5, Second Stipulation of Facts ("February 2015 Stip. Facts") at 1-2.

24.  On June 16, 2014, Petitioner's counsel, Ms. Cora Avinante, first informed Respondent's counsel of the existence of the purported Marriage Contract.  *Id.* at 2.  On June 19, 2014, Petitioner's counsel provided Respondent's counsel a copy of the purported Marriage Contract, and, on August 29, 2014, Petitioner's counsel, Ms. Micky Yamatani, provided Respondent's counsel the purported original of the Marriage Contract.  *Id.*  The parties specifically entered into no stipulation regarding the authenticity or admissibility of this purported Marriage Contract between Clara and Ramos.  *Id.*

25.  At the request of Respondent's counsel, on September 5, 2014,

the U.S. Department of Homeland Security, U.S. Immigration and Customs

Enforcement, Homeland Security Investigations Forensic Laboratory issued

Laboratory Report HIS-FL 14-01531 regarding the purported Marriage

Contract between Clara and Ramos.  *Id.* at 2-3; Gov't Ex. 8A.  Among other

findings, the Report found that the purported Marriage Contract "could not be

authenticated by comparative examination," and that the "document is offset

printed with impact printed data entries, contains a dry seal, and contains

handwritten signatures and register number, which would be consistent with

documents from that period of time."  Gov't Ex. 8A.

> 26.  At the request of Respondent's counsel, in September 2014, the

Law Library of Congress, Global Legal Research Center, issued a Report entitled

"Philippines: Effect of Not Registering a Marriage Contract with the Civil

Registry."  February 2015 Stip. Facts, at 3; Gov't Ex. 8B.  Among other findings,

the Report describes the purported Marriage Contract as follows:

> The contract appears to be incomplete in that the
> overleaf (page 2) contains a section with items that have
> been left blank.  Although the overleaf is blurry and
> hardly legible, it appears that the items left blank were
> supposed to have been completed and signed by the local
> civil registrar at the time that a copy of the marriage
> contract was presented for registration, pursuant to
> article 68 of the Philippines Civil Code as in force in
> 1970, which is cited in the instructions on the overleaf.

Gov't Ex. 8B at 1. The court's independent review of the purported Marriage Contract confirms that description. Items were left blank that apparently would be completed and signed by local authorities. Gov't Ex. 6 at 2.

27. The Law Library of Congress Report states that "Filipino scholars have written that not registering a marriage certificate in the local civil registry is not sufficient in itself to void [an] unregistered marriage, because registration is not an essential requirement for a valid marriage." *Id*. at 2 (citation omitted). The Report also states that "[c]ommon-law marriages recognized in England and the United States have never been and are still not recognized in the Philippines . . . . Accordingly, only ceremonial marriage, where solemnization is an inherent aspect, is recognized in the Philippines." *Id.* (citation omitted).

28. Prior to and at trial, the government objected to the admissibility of the purported Marriage Contract. *See, e.g.*, Doc. No. 54, Respondent's Substitute Trial Br. at 9. Petitioner has provided no declaration, affidavit, or other documentary basis explaining the discovery of the purported Marriage Contract such as who obtained it, the circumstances of its production, or a certification that it is genuine. The only basis of its authenticity is Clara's testimony at trial that it is a true and accurate document, and that a priest signed it in front of her. Doc. No. 66, Tr. at 75-76. She also testified that Petitioner gave it to her, *id*. at 83, 95,

but there was no further explanation as to how it came into Petitioner's possession. When asked "where Exhibit 6 came from," Clara testified "I do not know.  I do not know where it came from."  *Id*. at 83.  When asked if she knew "who discovered Exhibit 6," she testified "I do not know who had that made."  *Id.*  No other evidence was offered as to Exhibit 6's admissibility or authenticity.

29.    After trial, however, the government's position regarding the admissibility of the purported Marriage Contract changed -- it now affirmatively states that the court should admit it into evidence.  Doc. No. 68, Respondent's Post Trial Mem. at 4.  After reviewing *Vatyan v. Mukasey*, 508 F.3d 1179, 1183 (9th Cir. 2007) ("[A]n immigration petitioner may resort to any recognized procedure for authentication of documents in general, including the procedures permitted under Federal Rule of Evidence 901, and thus a petitioner's failure to obtain government certification of a foreign public document's authenticity is not necessarily a bar to admission of the document."), the government's position is that Clara's testimony is enough to meet a low threshold of admissibility, but that the court should give the document no probative weight in light of the nature of her testimony.  Doc. No. 68, Respondent's Post-Trial Mem. at 2-5.  (Conclusion No. 15, *infra*, formally admits Exhibit 6 into evidence.)

**F.    Petitioner Has Failed to Prove that Clara and Ramos Were Married**

30.   Clara did not marry Ramos before November 12, 1970 or after November 12, 1970.  February 2015 Stip. Facts at 4.  That is, if Clara and Ramos were married, they were married on November 12, 1970 as indicated on the purported Marriage Contract.

31.   The court has carefully considered and assessed Clara's trial testimony, including her credibility.  In doing so, the court considered her manner of testifying, her recall (or lack of recall) of material and relevant events, her impeachment at trial, and her potential bias in favor of Petitioner (her son).  Overall, the court finds that Clara was not a credible witness.  During Clara's testimony, she often appeared confused, and her memory spotty.  Although she testified with certainty (many times over) that she married Ramos on November 12, 1970 in a church, her memory as to other material events was very poor.  For example, she could not recall how long she was married to Ramos or how long they were together.  Doc. No. 66, Tr. at 31-34.[10]  She could not recall when Ramos

---

[10]  Clara testified at trial as follows:

> Petitioner's counsel:  Okay.  How long did you live with Jose Ramos?"
> Clara:  I do not know how long.
> . . . .
> Counsel:  How long were you married to Jose Ramos?

(continued...)

left her, or even when she married Lorenzo.  *Id*. at 76.[11]  Later, even with the

leading question, "So, Clara, you were married to Lorenzo Hernandez on June 28,

1975; isn't that correct?" she answered, "I do not know."  *Id*. at 78.  She also could

not explain why she was able to marry Lorenzo in 1975 if she was previously

married to Ramos -- that is, whether she believed Ramos had died, or for some

other reason.  *Id*. at 89-92, 96-99.  Finally, her testimony regarding her marriage to

Ramos (and the authenticity of the purported Marriage Contract) appeared to be

---

[10](...continued)
> Clara:  How long?  I don't -- we got married in 1970.
> . . . .
> Counsel [showing Clara her prior deposition testimony]:  . . . Does
> that refresh your recollection as to how long you were married?
> Okay?
> Clara:  About seven to eight years.  I do not know.  I forgot.
> Counsel:  Does that refresh your memory"
> Clara:  Maybe.  I'm not quite sure.

Doc. No. 66, Tr. at 31-34.

[11]  Clara testified at trial as follows:

> Counsel:  Now -- so, Clara, after you were married to Jose Ramos
> do you know when he left you?
> Clara:  No.
> Counsel:  So when did you marry your third husband?
> Clara:  I do not know what date was that. I think it's 1967 that one.
> I do not know.  I'm not sure.
> Counsel:  Would it refresh your memory if you were able to see the
> marriage certificate of your third husband?
> Clara:  I do not know -- I cannot recall.

Doc. No. 66, Tr. at 76.

overly coached in comparison to the rest of her testimony -- for example, she stated many times that she was married to Ramos "on November 12, 1970" and that "there is no divorce in the Philippines." And although Clara testified at trial that she married Ramos before a priest in a church, this testimony conflicted with her prior sworn deposition where she testified that she had been married to Ramos by a judge in a courthouse office. *Id.* at 84-87.

32. Given Clara's lack of credibility (and in particular, as to the purported Marriage Contract), the court has no basis to find the purported Marriage Contract to be authentic or legitimate. That is, Petitioner has not met his burden to show the purported Marriage Contract is genuine. Moreover, the purported Marriage Contract is incomplete. The form has spaces for registration by a local civil registrar, which are blank. Although the court understands and accepts that a solemnized marriage in the Philippines is valid even if not subsequently registered with civilian authorities,[12] there is no evidence that this marriage contract was in fact registered. The purported Marriage Contract states that a "Marriage License No. 11461, issued at Pamplona, Cagayan Nov. 12, 1970 in favor of [Clara and Romeo], was exhibited to [the priest]," but there is no other

---

[12] The government, based on an opinion from the Library of Congress, agreed that "if there was a valid marriage but merely a defect in recording the marriage, under Philippine law there is a valid marriage." Doc. No. 66, Tr. at 21-22.

evidence of a "Marriage License No. 11461." And, as established to follow, the Pamplona, Cagaya Civil Registrar has no record of a Marriage License, or of a marriage between Clara and Romeo.

33. On September 23, 2014, the Republic of the Philippines, Office of the Civil Registrar, Pamplona, Cagayan, issued Civil Registry Form No. 3B (Marriage -- Not Available), regarding records related to the purported marriage of Clara and Ramos who were alleged to have been married on November 12, 1970. February 2015 Stip. Facts, at 3; Gov't Ex. 8C. (The government asserts that this is the office that would have issued "Marriage License No. 11461" referenced in the purported Marriage Contract -- an assertion that is logical, but that the court is unable to confirm.) The "Municipal Civil Registrar" states that "this office has no record of marriage between JOSE C. RAMOS and CLARA S. AGCAOILI who ware alleged to have been married on 12th November 1970 in this city/municipality[.]" Gov't Ex. 8C. It also certifies "that the records of Marriage for the year 1970 are still intact in the archives of this office." *Id.*

34. The Republic of the Philippines, National Statistics Office, Manila, Office of the Civil Registrar General, Pamplona, Cagayan, issued on June 26, 2014, CRS Form 3 (Negative Certification of Marriage) stating that the office does not have any record of a marriage of Clara and Ramos on November 12,

1970.  February 2015 Stip. Facts, at 3-4; Gov't Ex. 8D.

35.  On May 5, 2014, the Republic of the Philippines, Office of the Civil Registrar, Santa Maria, Pangasinan, issued Civil Registry Form No. 3B (Marriage -- Not Available), regarding records related to the purported marriage of Clara and Ramos who were alleged to have been married on November 12, 1970. February 2015 Stip. Facts, at 4; Gov't Ex. 8E.  In this document, the "Municipal Civil Registrar" for Santa Maria, Pangasinan certified that it has no record of marriage of Clara and Ramos.  Gov't Ex. 8E.  It also certified that the records of marriages for 1970 are still intact in the office's archives.  *Id.*

36.  Without proof of the authenticity and legitimacy of the purported Marriage Contract, and given the lack of credible testimony from Clara as to a marriage, there is no evidence of a prior marriage between Clara and Ramos on November 12, 1970.  That is -- although the court finds that Clara and Ramos had a relationship and bore two children (Romeo and Domingo) -- there is simply no proof of a marriage.  Indeed, even aside from the documented lack of a registered marriage in Philippine civil registries, all the other evidence admitted at trial suggests the opposite (*i.e.*, that they were not married on November 12, 1970).  To summarize:

> • None of the I-130 forms (submitted by Clara under oath to immigration officials for her other children) recognize a former

marriage between Clara and Romeo. They do, however, acknowledge Clara's marriages to Arellano (in 1958) and/or to Lorenzo (in 1975). Gov't Exs. 4BB to 4FF.

• An I-130 form submitted by Clara for Domingo Agcaoili (Clara and Romeo's son) in 1985 provides, under penalty of perjury, that Domingo Agcaoili is Clara's "illigitimate [sic] son." Gov't Ex. 4EE at 1. It lists marriages to Arellano and Lorenzo, but also fails to list Ramos as a former spouse. *Id.* at 2.

• Likewise, Domingo Agcaoili's birth certificate does not refer to a marriage between Clara and Romeo, Gov't Ex. 4J, and a certified birth record states that Domingo Agcaoili is "illegitimate." Gov't Ex. 4K.

• An I-130 form submitted by Clara for Romeo Ramos in 1990 lists Clara's "present marriage" date as "11/12/[unintelligible]." Gov't Ex. 4FF; February 2015 Stip Facts at 5. Clara testified that she thought the year of her present marriage on the form was "1980," Doc. No. 66, Tr. at 38, which would be consistent with a Philippine form that certified Clara's marriage to Lorenzo (not Ramos). *See* Gov't Ex. 4Q (Philippine form, dated November 12, 1980, certifying a marriage between Clara and Lorenzo on June 28, 1975). That is, this form also does not refer to a marriage between Clara and Ramos.

• Although Romeo Ramos' birth certificate refers to a marriage between Clara and Romeo, it provides only a year (1966) which Petitioner agrees is false. April 2014 Stip. Facts at 10.

37. Although Petitioner has failed to prove Clara and Romeo were married on November 12, 1970, the court nevertheless credits Clara's testimony that she saw Ramos at the funeral of Romeo Ramos (one of the sons of Clara and Ramos) when Clara returned to the Philippines in October and November of 1993. Tr. at 56-57, 72. But whether or not Ramos was alive at that time (and thus was

alive when Clara married Lorenzo in 1975), does not affect the court's Finding

that Clara and Ramos were not married on November 12, 1970.

38.  In sum, considering the totality of the evidence, Petitioner has

failed to meet his burden to prove that Clara and Ramos were married on

November 12, 1970 (or anytime before Clara married Lorenzo on June 28, 1975).

That is, Petitioner has failed to prove that Clara's marriage to Lorenzo is void.

And, as the legitimate child of Clara and Lorenzo, Petitioner has failed to prove he

was born "out of wedlock."

## V.  <u>CONCLUSIONS OF LAW</u>

1.  The court has jurisdiction to consider Petitioner's claim to be a

national of the United States under 8 U.S.C. § 1252(b)(5)(B).  Doc. No. 23, Gov't

Ex. 2, Apr. 4, 2014 Agreed Principles of Law ("April 2014 Agreed Principles").

2.  Venue is proper in this district because Petitioner resides in the

State of Hawaii.  *Id.* at 2.

3.  Under 8 U.S.C. § 1252(b)(5)(B), the action was transferred for a

"new hearing" or *de novo* trial on the merits as if an action had been brought in the

district court under 28 U.S.C. § 2201.  *Id.*  Under 8 U.S.C. § 1252(b)(5)(B),

Petitioner is in the position of a plaintiff seeking a declaratory judgment finding

that he is a United States citizen.  *Id*; *see, e.g.*, *Sanchez-Martinez v. I.N.S.*, 714

F.2d 72, 74 n.1 (9th Cir. 1983); *Chau*, 247 F.3d at 1028-29.

4.   Because Petitioner was born in the Philippines and is claiming derivative citizenship, Petitioner has the burden of proving his claim by a preponderance of the evidence.  April 2014 Agreed Principles at 2; *see, e.g.*, *Scales v. I.N.S.*, 232 F.3d 1159, 1163 (9th Cir. 2000) ("In deportation proceedings, the INS has the burden of establishing the facts supporting deportability by 'clear, unequivocal, and convincing evidence.'  Evidence of foreign birth, however, gives rise to a rebuttable presumption of alienage, and the burden then shifts to the petitioner to prove citizenship."); *Sanchez-Martinez*, 714 F.2d at 74 n.1; *Murphy*, 54 F.3d at 609; *Yee Tung Gay v. Rusk*, 290 F.2d 630, 631 (9th Cir. 1961) (holding that party seeking declaration of citizenship has the burden of establishing citizenship by a "fair preponderance of the evidence").

5.   There are two sources of United States citizenship: birth and naturalization.  *Miller v. Albright*, 523 U.S. 420, 423 (1998) (citing *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898)).  "Persons not born in the United States acquire citizenship by birth only as provided by Acts of Congress."  *Id.* at 424 (quoting *Wong Kim Ark*, 169 U.S. at 703).

6.   "A person born in Hawaii on or after April 30, 1900, is a citizen of the United States at birth."  8 U.S.C. § 1405.

7.  Under the relevant law in effect at the time of Petitioner's birth,

United States citizenship could be conferred at birth to:

> A person born outside the geographical limits of the
> United States and its outlying possessions of parents one
> of whom is an alien, and the other a citizen of the United
> States who, prior to the birth of such person, was
> physically present in the United States or its outlying
> possessions for a period or periods totaling not less than
> ten years, at least five of which were after attaining the
> age of fourteen years: Provided, that any periods of
> honorable service in the Armed Forces of the United
> States by such citizen parent may be included in
> computing the physical presence.

8 U.S.C. § 1401(a)(7) (redesignated in 1978 as § 1401(g)).  Because "Clara was

not physically present in the United States or its outlying possessions for at least

five years after she attained the age of fourteen years" (Finding No. 14), Petitioner

does not qualify for derivative citizenship under § 1401(g).[13]

8.  "'The applicable law for transmitting citizenship to a child born

abroad when one parent is a U.S. citizen is the statute that was in effect at the time

of the child's birth.'"  *United States v. Viramontes-Alvarado*, 149 F.3d 912, 915

---

[13]  As found above, the Immigration Judge determined that Petitioner did not qualify for
citizenship under this provision, and the BIA upheld that determination.  April 2014 Stip. Facts
at 2-3.  The court is uncertain whether § 1401(g) is still at issue before the Ninth Circuit.  Given
the Stipulated Findings regarding Clara's years of physical presence in the United States,
Petitioner has not advocated before this court for citizenship under this provision.  The court,
however, addresses § 1401(g) in these Findings and Conclusions to assure that the court
complies with the Ninth Circuit's directive "of making a *de novo* determination of petitioner's
claim of United States citizenship."  Doc. No. 1, Ninth Cir. Order at 1.

(9th Cir. 1998) (quoting *Ablang v. Reno*, 52 F.3d 801, 803 (9th Cir. 1995)).

9.  Petitioner seeks derivative citizenship based on 8 U.S.C.

§ 1409(c), which, at the time of his birth, provided:

> Notwithstanding the provision of subsection (a) of this
> section, a person born, on or after the effective date of
> this chapter [December 24, 1952], outside the United
> States and *out of wedlock* shall be held to have acquired
> at birth the nationality status of his mother, if the mother
> had the nationality of the United States at the time of
> such person's birth, and if the mother had previously
> been physically present in the United States or one of its
> outlying possessions for a continuous period of one year.

8 U.S.C. § 1409(c) (1952) (emphasis added).[14]

10.  The term "out of wedlock" is not defined in the Immigration and

Naturalization Act.  *See Scales*, 232 F.3d at 1163 n.8.  The Ninth Circuit, however,

defines the relevant terms in this context as follows:  "A 'legitimate' child is one

'[b]orn of legally married parents,' or 'born or begotten in lawful wedlock or

legitimized by the parents' later marriage.'  An 'illegitimate child' is one 'neither

born nor begotten in lawful wedlock nor later legitimized.'"  *Id*. (quoting Black's

Law Dictionary 912, 232 (7th ed. 1999)); April 2014 Agreed Principles at 6.

---

[14]  The "effective date of this chapter" was "180 days after June 27, 1952," which is
December 24, 1952.  *See* 8 U.S.C.A. § 1409, Historical Note (West. 1970).  Section 1409 has
been amended several times since its enactment in 1952.  In 1988, Congress substituted "after
December 23, 1952" for "on or after the effective date of this chapter" in § 1409(c).  *See* Pub. L.
100-525, § 9(r)(2) (1988).

11.  The parties agree that Philippine law controls when determining whether Petitioner was born "out of wedlock."  Specifically, they have stipulated to certain Principles of Philippine law that are "not disputed" and "are binding on the parties in this case," April 2014 Agreed Principles at 8, and that principles of Philippine law "govern the decision in this case."  Doc. No. 52, Supplemental Agreed Principles of Law Governing the Decision ("February 2015 Agreed Principles") at 1.  In this regard, the laws of the jurisdiction where Petitioner's parents were married determines whether the marriage was lawful when Petitioner was born -- and thus such laws also control whether Petitioner was born out of wedlock.[15]  *See Ng Suey Hi v. Weedin*, 21 F.2d 801, 801-02 (9th Cir. 1927) (explaining, in addressing the legitimacy of a child in an immigration matter, that "[t]he general rule is that the validity of a marriage is determined by the law of the place where it was contracted; if valid there, it will be held valid everywhere"); *Inaba v. Nagle*, 36 F.2d 481, 481 (9th Cir. 1929) ("The marriage was contracted in accordance with the laws of Japan, and of course the laws of that country are controlling.") (citing *Ng Suey Hi*); *cf. Brissett v. Ashcroft*, 363 F.3d 130, 134 n.3

---

[15]  The parties agreed to a broad statement that "[t]he laws of the jurisdiction where the child was born control the determination of whether a child is born out of wedlock," April 2014 Agreed Principles at 6 (citing *Scales*, 232 F.3d at 1163).  But *Scales* does not support that proposition.  Rather, in the present context, the focus must be on the nature of the marriage of Petitioner's parents, and whether that marriage is void under the laws that recognized the marriage.  Here, the court looks to Philippine law for that determination.

(2d Cir. 2004) ("A divorce or separation obtained in accordance with the laws of the nation having jurisdiction of the marriage should constitute a 'legal separation' within the meaning of [8 U.S.C.] § 1432(a)(3), regardless of whether the procedures of that nation conform to those employed in the states of the United States.").

12.   The parties agreed upon numerous principles of Philippine law as being binding and in effect in 1975.  *See generally* April 2014 Agreed Principles; February 2015 Agreed Principles.  Among those principles of Philippine law are the following:

> a.  "Marriage is an inviolable social institution governed by law." February 2015 Agreed Principles at 2 (citing Article 52, Civil Code of the Philippines 267-69 (6th ed. 1969) ("Civil Code");
>
> b.  "No marriage shall be solemnized unless all these requisites are complied with:
> > (1) Legal capacity of the contracting parties
> > (2) Their consent, freely given
> > (3) Authority of the person performing the marriage; and
> > (4) A marriage license, except in a marriage of exceptional character."
>
> *Id.* (citing Article 53, Civil Code at 269-72);
>
> c.  Regarding requisite for marriage No. 4 (marriage license), Comment 6(a) to Civil Code, Art. 43 provides that "[w]hat is required is the marriage license, not the marriage certificate.  The latter is not an essential requisite; thus, an oral marriage is valid."  Gov't Ex. 7, Doc. No. 52-1, Civil Code at 271;
>
> d.  "No marriage shall be solemnized without a license first being

issued by the local civil registrar of the municipality." February 2015 Agreed Principles at 2 (citing Article 58, Civil Code at 276-77);

e. "It is the duty of the person solemnizing the marriage to furnish to either of the contracting parties a copy of the marriage contract, and to send one copy to the local civil registrar." *Id*. at 3 (citing Article 68, Civil Code at 290-91)

f. Regarding legal separation in the Philippines, the Civil Code discusses two kinds of divorce: "Absolute divorce (the marriage is dissolved) and Legal separation (the marriage is not dissolved and the parties are merely separated from bed and board)." *Id*. (citing Title IV, cmt., Civil Code at 349. "The Act 2710 (old divorce Law) was repealed by the new Civil Code on August 30, 1950, and now, with the exceptions of Moslem divorces, there is only legal separation in the Philippines." *Id*. (citing Civil Code at 452 & nn. (5) & (6)).

g. "Acts, events, and judicial decrees concerning the civil status of persons shall be recorded in the civil register." *Id.* at 4 (citing Article 407, Civil Code at 731).

h. "The following shall be entered into the civil register: (1) births; (2) marriages; (3) deaths; (4) legal separations; (5) annulments of marriage; (6) judgments declaring marriages void from the beginning; (7) legitimations; (8) adoptions; (9) acknowledgments of natural children; (10) naturalization; (11) loss, or (12) recovery of citizenship; (13) civil interdiction; (14) judicial determination of filiation; (15) voluntary emancipation of a minor; and (16) changes of name." Gov't Ex. 7, Doc. No. 52-1 at 75, Article 408, Civil Code at 731.

13. The June 28, 1975 marriage of Clara and Lorenzo was a lawful marriage under Philippine law. Gov't Ex. 4P.

14. The marriage of Clara and Lorenzo was recorded in the Philippine civil register in compliance with Articles 407 and 408 of the Civil

Code.  Gov't Exs. 4M, 4P.  In contrast, the relevant civil registrars have no record of a November 12, 1970 marriage between Clara and Ramos in compliance with Articles 407 and 408 of the Civil Code.  Gov't Exs. 8C, 8C, & 8E.

15.  Government Exhibit 6, the November 12, 1970 purported Marriage Contract between Clara and Ramos, was not admitted into evidence at trial, pending post-trial briefing from both parties as to its admissibility.  After considering such briefing, Exhibit 6 is now admitted into evidence based upon Clara's trial testimony.  *See* Doc. No. 66, Tr. at 75-76.  *Vatyan* held that an immigration "petitioner's own testimony is a proper method that may be used to authenticate foreign public documents."  508 F.3d at 1185.  Clara's testimony, although ultimately not credible in key instances, is enough to meet a low threshold of admissibility as discussed in *Vatyan*.  After admission, however, "[a]t that point the matter is committed to the trier of fact to determine the evidence's credibility and probative force."  *United States v. Whitworth*, 856 F.2d 1268, 1283 (9th Cir. 1988) (quoting *United States v. Johnson*, 637 F.2d 1224, 1247 (9th Cir. 1980)).

16.  Because Petitioner has failed to meet his burden to prove that he was born "out of wedlock" (Finding No. 38, *supra*), Petitioner is not entitled to derivative citizenship under 8 U.S.C. § 1409(c).

## VI.  CONCLUSION

Pursuant to 8 U.S.C. § 1252(b)(5)(B), after conducting a trial *de novo*,

the court finds and concludes that Petitioner has failed to meet his burden to prove

his claim of derivative United States citizenship.  Judgment shall issue in favor of

Respondent and against Petitioner.  The Clerk of Court shall transmit of copy of

the Judgment and these Findings and Conclusions to the Clerk of the Ninth Circuit

Court of Appeals (Appeal No. 09-73088).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii:  June 25, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Hernandez v. Lynch*, Civ. No. 12-00639 JMS-BMK, Findings of Fact and Conclusions of Law